[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On November 10, 1998, the Department of Children and Families (D.C.F) filed petitions to terminate the parental rights of Natasha H and Miguel L as to their daughter Sasha. Respondent mother was served with the petition via publication and respondent father was served with the petition in hand. Ms. H and Mr. L were represented throughout the entire proceeding by counsel. This court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court. The statutory grounds for both the respondent mother and the respondent father are the same: abandonment, failure to rehabilitate, and no ongoing parent-child relationship. On January 17, 2001, the court (Conway, J.) granted D.C.F.'s Motion to Amend the Petition filed on November 10, 1998. Both the respondent mother and the respondent father oppose the termination of their respective parental fights. The trial commenced on March 19, 2001, and resumed on March 23, 2001. Evidence and closing argument concluded on April 27, 2001.
Sasha was born on June 1997. She was classified as a high risk baby because both respondent mother and Sasha tested positive for cocaine when Sasha was born. Because Ms. H was unable to provide for the care of Sasha, an Order of Temporary Custody was applied for and granted by the Court (Jones, J.) on June 20, 1997. On June 30, 1997, the Order of Temporary Custody was confirmed (Jones, J.). Neglect petitions were also filed. Sasha was placed with her foster parents, Alenjandrino and Flora Sinon June 20, 1997, and has remained there since. CT Page 7239
On October 2, 1997, at a hearing on the neglect petition (Jones, J.). Ms. H was defaulted, father was noted as "unknown", Sasha was adjudicated neglected and she was committed to the care and custody of D.C.F. On September 2, 1998, that commitment was extended to October 2, 1999, and on that date reunification efforts with both respondent mother and respondent father were deemed not to be appropriate (Cohn, J). After a short interim extension was granted, the court extended the commitment on October 28, 1999, to October 2, 2000. Continuing efforts with the respondent mother were still deemed by the court to be inappropriate but the court found that such efforts were appropriate as to the respondent father (Dewey, J.). On September 20, 2000, the commitment was extended to October 2, 2001 (Conway, J.). The court found that reunification efforts with both respondent mother and respondent father were once again inappropriate.
Ms. H had three visits with the Sasha during July and August of 1997, and would also call Mrs. S to see how Sasha was doing. Then, according to the testimony of Mrs. S (T. pg. 203), Ms. H All of a sudden . . . just dropped out of the picture." Ms. H's whereabouts became unknown. Mishonda James a D.C.F. social worker assigned to the case attempted to contact the respondent mother but as unable to do so. Subsequently, Ms. H was incarcerated and her counselor at the correctional facility notified D.C.F. of Ms. H's incarceration. In response to a request from Ms. H a visit with Sasha occurred in the correctional facility on June 18, 1999. Since June of 1999, respondent mother has visited with Sasha on only two other occasions — on September 8, 2000, at Painter Park in West Haven, and on October 13, 2000, at McDonald's. Ms H sent Christmas gifts to Sasha in December of 1999.
In December of 1998, Ms. H was released from incarceration and was ordered to attend drug rehabilitation programs and drug court. She failed to do so and was re-arrested. During this incarceration, Ms. H participated in the Marilyn Baker substance abuse program. Ms. H was paroled on March 14, 2000, and was successfully discharged from parole on March 25, 2001. While on parole she has successfully completed both the Zero Tolerance Program and the Project Moore Program. After a period of time at a Oxford House, a sober residence, Ms. H moved in with her fiance.
Mr. L was not a participant in either these proceedings or Sasha's life until July of 1998. During July of 1998, he contacted D.C.F. and met with Mishonda James. He acknowledged being involved in a relationship with Ms. H and was "adamant" (T. pg. 47) that he was the father of Sasha. Mr. L did not ask for a paternity test, but upon the motion of D.C.F. a paternity test was performed and on March 22, 1999, that test confirmed CT Page 7240 that Mr. L is the father of Sasha. On October 28, 1999, during a hearing on the termination of parental rights petition, Mr. L stated that he wanted to pursue custody of Sasha. An agreement was reached whereby D.C.F. changed their recommendation from termination of parental rights to re-unification with the respondent father. The agreement gave Mr. L six months to meet reunification expectations. Specific steps were signed by Mr. L.
Sixteen visits were set up by D.C.F. between Jan 7, 2000, and July 7, 2000. of those visits Mr. L attended nine, one was cancelled because Sasha was sick, and five were cancelled by Mr. L. The last visit scheduled for July 7, 2000, could not take place because Mr. L was arrested on July 4, 2000, and was incarcerated.
Mr. L was incarcerated for various narcotic offenses and was placed on parole on December 27, 1999. He was scheduled to be discharged from parole on February 9, 2001. Mr. L was arrested for a Breach of the Peace charge arising from a domestic violence incident that occurred on July 4, 2000. Officer Valentin of the New Haven Police Department testified that on that date he responded to 176 Hallock Avenue in New Haven. When he arrived there he encountered an irate Miquel L. Sharon L, Mr. L's wife, told Officer Valentin that she and her husband had been fighting over money and that he had slapped her. Officer Valentin noticed redness to her forehead and subsequently arrested Mr. L for Breach of the Peace. The Breach of the Peace charged was nolled but Mr. L was remanded for a parole violation until he was re-paroled on October 26, 2000. Mr. L also received a 48 hour lock down while on parole from December 19, 2000, until December 21, 2001, for admitting using marijuana in violation of his Zero Tolerance Drug Program. Also, during the last few days of his parole he was classified as an absconder. However, because there were only few days left on his sentence, the parole supervisor decided not to remand him back to incarceration.
The hearing on a petition to terminate parental rights is comprised of two parts. In the adjudicatory phase the trial court must determine whether any of the statutory grounds alleged by D.C.F. exists by clear and convincing evidence. In the adjudicatory phase the court is limited to considering events preceding the filing of the termination petition or the latest amendment. If a determination is made that one or more of the statutory grounds exists, the court then proceeds to the dispositional phase. In this phase the court determines whether the termination of parental rights is in the best interest of the child. In making this determination the trial court can consider all events occurring prior to the date(s) of the dispositional hearing including those occurring after the filing of the petition. CT Page 7241
 ADJUDICATORY FINDINGS
ABANDONMENT
"Abandonment focuses on the parent's conduct . . . A lack of interest in the child is not the sole criterion in determining abandonrnent . . . C.G.S. Section 17a-112 (j)(3)(A) defines abandonment as the [failure] to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern, or responsibility for the welfare of the child . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . Section 17a-112 (j)(3)(A) does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing reasonable degree of concern." In re John G. 56 Conn. App. 12,20-21 (1999)
The respondent mother visited Sasha on July 13, 1997, July 21, 1997, and August 1, 1997. The next scheduled visits never happened because Ms. H did not show up. At about this time Ms. H also stopped contacting Mrs. S by phone. The next visit was not until June 18, 1999, and that was only after a counselor at the correctional facility called D.C.F. and informed them that Ms. H was incarcerated. For approximately twenty-two months the respondent mother, despite D.C.F. efforts, had no contact with Sasha. Statutory abandonment has been proven by clear and convincing evidence.
Mr. L contacted D.C.F. sometime in July of 1998, stating he was the father of Sasha. Up to this date Mr. L had never visited Sasha. According to Ms. James he did not "express any interest in custody, paternity testing or visitation at that time . . . [he wanted to be Sasha's] spiritual guider, Godfather" (T. pg. 47). On the T.P.R. plea date of January 27, 1999, Mr. L expressed his desire to obtain custody of a child that he had never had contact with. However, it was D.C.F. who moved for a paternity test, which confirmed on March 22, 1999, that Mr. L was the father of Sasha. Mr. L was incarcerated on October 14, 1998, and while incarceration by itself does not constitute abandonment (In re RoshawnR., 51 Conn. App. 44, 53 (1998)) Mr. L did not at any time ask D.C.F. for visits with Sasha or for D.C.F. to provide any services to help with reunification. It is also noteworthy that Mr. L was not in court on any of the days while the hearing as to if his parental rights was being held. This half-hearted attempt by Mr. L are reflected in the fact that CT Page 7242 he told Ms. James initially, that he did not want to disrupt the Sasha's life, because she felt comfortable in her foster home. Whatever Mr. L's motives, his actions during this time fulfill the definition of abandonment by clear and convincing evidence.
FAILURE TO REHABILITATE
Statutory grounds exists to terminate parental rights when "[the parent] of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . ." C.G.S. Section 17a-112 (j)(3)(B). In analyzing a respondent's parent's rehabilitative status the court must look at the status as it relates to the particular child, and such rehabilitation must be foreseeable within a reasonable time. In re Roshawn R., 51 Conn. App. 44,54-55 (1998).
At various times between June 30, 1997 and August of 1998, D.C.F. made referrals to various agencies and programs to try and get Ms. H help for her substance abuse problem. Except for a short-lived referral to the APT Foundation Ms. H did not take advantage of any of the programs offered by D.C.F., and in fact in August of 1998, Ms. H did not even return the phone call of the D.C.F. social worker who was trying to help Ms. H.
Ms. H recently turned twenty-seven. She started with her substance abuse at age 12. The testimony establishes that she has been substance free for approximately 14 months. For this she has to be given a great amount of credit. However, this period of sobriety is to be compared to the fact that she has spent the majority of her adult life being addicted to various substances. An addiction so strong that it led to her being convicted for a series of offenses that resulted in her incarceration. An addiction so strong that Ms. H used cocaine throughout her pregnancy up until a few hours prior to Sasha's birth. Dr. Meier noted Ms. H's relatively recent progress and her history of relapse in his report. Dr. Meier also noted that given the young age of Sasha that the outer limit for permanency planning for a child of this age is two years. Sasha will soon be four, "[c]ourts are entitled to give great weight to professionals in parental termination cases." In re Christina V.,38 Conn. App. 214, at 221. It is the child's needs that dictate that a finding of failure to rehabilitate be made. Ms. H may in the future be capable of effectively parenting a child. However, it is the court's finding, by clear and convincing evidence, that given Sasha's needs, Ms. H cannot in a reasonable amount of time become capable of parenting Sasha. CT Page 7243
Mr. L signed specific steps on October 28, 1999. One of those specific steps was that Mr. L was to have no further involvement with the criminal justice system. On July 4, 2000, Mr. L was arrested for a Breach of the Peace. The charge was subsequently nolled. By definition a nolle is an election by a prosecutorial official not to proceed with prosecution. Merely because a case was nolled does not mean that Mr. L had no involvement with the criminal justice system. The July 4, 2000, incident is a violation of this specific step. A second specific step was that Mr. L comply with the conditions of his parole. Mr. L's parole officer Alan Greene revoked Mr. L's parole based on his July 4, 2000, arrest and he was reparoled on October 26, 2000. In addition Mr. L was given a 48-hour lock down for admitting that he had used marijuana. Therefore, Mr. L violated not only the specific step that he comply with the conditions of his parole, but also the specific step of no substance abuse. In addition to these failures to comply with specific steps Sasha's need for permanency dictate that a finding of failure to rehabilitate be made. It is the Court's finding that by clear and convincing evidence that given Sasha's needs, Mr. L cannot in a reasonable amount of time become capable of parenting Sasha.
NO ONGOING PARENT-CHILD RELATIONSHIP
"C.G.S. Section 17a-112 (j)(3)(D) provides for the termination of parental rights if, upon clear and convincing evidence, it is proven that no ongoing parent-child relationship existed in excess of one year. This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop" In re John G.,56 Conn. App., 12, 22.
Normally, this is a ground that is not alleged by D.C.F. when a child is taken soon after its birth. However, In re John G., supra, clearly allows D.C.F. to allege, and the court to find, that there is no ongoing parent-child relationship if there were infrequent contacts with the parent and the child has no positive feelings or memories of the parent.
Between, July 13, 1997, and October 13, 2000, Ms. H visited Sasha six times. Mr. L. visited Sasha nine times between Jan 7, 2000, and June 29, 2000. Sasha views the respondent mother as a stranger who is nice to her, that she knows slightly and with whom she interacts as if the respondent was a playmate. There is no bond between them and Sasha does not view Ms. H as a psychological parent. Sasha seems more familiar with Mr. L, because she saw him more frequently than she did Ms. H. However, CT Page 7244 the nature of their relationship is the same as the relationship she has with Ms. H. When Sasha returned from visits with the respondent mother and the respondent father she regressed in bladder and bowel training, started having nightmares, was not eating properly, had temper fits, and became more "clingly" with Mr. S to the point where she would not leave Mrs. S's side. Megan Lyons a clinical social worker at the Yale Child Study Center classified Sasha as having separation anxiety disorder. After visitations were ceased Sasha stopped exhibiting this behavior and went back to being herself doing well at school and at home. Sasha views Mr. and Mrs. S as her parents. It would be detrimental to Sasha's best interest to allow time for a parent-child relationship to develop. Therefore, as to both parents, the ground of no ongoing parent-child relationship has been proven by clear and convincing evidence.
 DISPOSITION
In the dispositional phase of a termination case, the court must consider whether D.C.F. has proven by clear and convincing evidence that "termination is in the best interest of the child." It is in the best interest of Sasha to have the parental rights of both the respondent mother and the respondent father terminated.
In accordance with C.G.S. Section 17a-112 (k) the court makes the following findings:
(1) The court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parents. Early on D.C.F. made efforts to help Ms. H with her problems. Ms. H did not take advantage of these services then was in parts unknown for a substantial length of time. In addition, for three successive years a finding that reunification efforts with Ms. H were not appropriate was made by the court. D.C.F. also arranged for visitation however Ms. H failed on many occasions to take advantage visitation. Mr. L was also offered services and while he did attend parenting classes at the New Haven Family Alliance, he did not avail himself of either individual counseling or drug treatment. In addition D.C.F. also arranged for visitation for Mr. L.
(2) This court finds that D.C.F. made reasonable efforts to reunite the parents with the child pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. Ms. H's continued whereabouts in parts unknown for a considerable length of time and her lack of participation with D.C.F. prevented reunification. Mr. L's ambivalence as to what role he should play in Sasha's life as well as his failure to take advantage of the services offered to him prevented reunification. CT Page 7245
(3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order must also be addressed. There were no court ordered specific steps for Ms. H. There were court ordered specific steps signed by the court on October 28, 1999, for Mr. L. While Mr. L did attend parenting classes at the New Haven Family Alliance, he failed to obtain individual counseling, or drug treatment. In addition, he had further involvement with the criminal justice system, violated the conditions of his parole and engaged in substance abuse — all in violation of the specific steps.
(4) The feelings and emotional ties of the child with respect to the child's parents, any guardian of the child, and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant ties must be addressed. Sasha has no emotional ties with either the respondent mother or the respondent father. Sasha views them as, at best, adult playmates. Conversely, Sasha views Mr. and Mrs. S as her parents. Sasha is strongly bonded with the S. They love her and want to adopt her. They are Sasha's psychological parents.
(5) Sasha is 3 years old but will be four in a few days.
(6) The efforts the parent has made to adjust her or his circumstances, conduct or conditions to make it in the best interest of the child to return to such home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child has been discussed previously. For approximately two years Ms. H chose, either because of lack of interest or because of her substance-abuse lifestyle, to have, in effect, no contact with Sasha. For the next two years, Ms. H has only had contact twice with Sasha. Visits were stopped due to the adverse effect that they were having on Sasha. Yet Ms. H never called Mrs. S to see how Sasha was doing, sent her a card, and except for Christmas of 1999, sent no gifts to Sasha acknowledging holidays or her birthday. Mr. L waited fifteen months before asking for visits and when visitation was arranged missed almost 60% of the visits. When he was re-incarcerated and visits were stopped due to the adverse effect they were having on Sasha, Mr. L never inquired of anyone how Sasha was doing, let alone send any cards or gifts.
(7) The final consideration is the extent to which a parent has been CT Page 7246 prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any person or by the economic circumstances of the parent. The major obstacles that prevented contact between Sasha and Ms. H and Sasha and Mr. L are the same. Those are the respondent mother's and respondent father's criminal behavior, incarceration and re-incarceration, substance-abusing lifestyles and ambivalence as to what role they should play in the life of Sasha. The last, at least, showing some insight into the fact that Sasha is thriving with Mr. and Mrs. S.
CONCLUSION
Based on the foregoing findings, the court determines that it is in the best interest of Sasha that a termination of parental rights be entered with respect to both the respondent mother and the respondent father. Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of D.C.F. is appointed statutory parent for Sasha. The Commissioner shall file with this court no later that thirty days following the judgement a written report of efforts to effect a permanent placement for Sasha and file further reports as are required by state and federal law.